United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| RONALD N. HURTADO, | No. C 11-00037 PJH (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY** |
| vs. | |
| DERRAL ADAMS, Warden, | |
| Respondent. | |

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254.  The court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court.  Petitioner responded with a traverse.  For the reasons set out below, the petition is denied.

**BACKGROUND**

On May 6, 2008, a jury convicted petitioner on three counts of attempted murder, see Cal. Penal Code §§ 187(a), 664, one count of shooting at an occupied vehicle, see Cal. Penal Code § 246, and one count of attempting to dissuade a witness, see Cal. Penal Code § 136.1(a)(2).  Respondent's Exhibit ("Resp. Exh.") 10 at 280-88.  As to all five counts, the jury found true various allegations that petitioner committed the offense for the benefit of, or in association with a criminal street gang, see Cal. Penal Code § 186.22(b)(1), and that petitioner either personally used or personally and intentionally discharged a firearm, see Cal. Penal Code §§ 1203.06(a)(1), 12022.5(a), (a)(1),12022.53(b), (c).  Id. On July 11, 2008, the court sentenced petitioner to a total term

**United States District Court**
For the Northern District of California

of 22 years to life in prison for shooting at an occupied vehicle and attempting to dissuade a witness, plus a 37 year consecutive term for one of the attempted murder counts.  Resp. Exh. 10 at 289-92.   Two additional 37 year terms were ordered to be served concurrently for the remaining attempted murder counts.  *Id.*  On December 8, 2009, the California Court of Appeal affirmed the convictions but modified the judgment to stay the concurrent sentence and associated enhancements on one of the attempted murder counts.  Resp. Exh. 4, *People v. Hurtado*, 2009 WL 4643729 (Cal. App. 1 Dist., 2009).  A petition for review was summarily denied by the California Supreme Court on February 18, 2010.  Resp. Exh. 6.  A petition for writ of habeas corpus was summarily denied by the California Supreme Court on October 27, 2010. Resp. Exh. 8.

The facts, as described by the California Court of Appeal, are as follows:

**A. Prosecution Case**

On December 2, 2005, Arlen Padilla drove his sister and his mother Maria in his van to an apartment where his sister's friend lived.  Padilla parked in the driveway outside the apartment, and he and Maria stayed outside while his sister went in to visit her friend.  Fifteen minutes later, as Padilla, his mother, and his sister were driving away down the driveway, a male, later identified as defendant, stared at them, and then Padilla saw defendant aiming a gun at him, and heard seven to nine gunshots.  Padilla's sister was sitting in the front passenger seat and Maria was sitting in the middle of the back seat.  Padilla accelerated, but a bullet hit his gas tank, his electricity failed, and the van came to a stop.  The shooter, who was wearing a beret, a black jacket, black pants, and a black T-shirt, then jumped into the passenger side of a Ford Expedition, which sped off.

Padilla and his sister both recognized defendant before he started shooting.  Approximately one year earlier, defendant and another man followed Padilla and his brother into a bathroom at the Southland Mall, blocked the door, and asked Padilla whether he was a Northside Hayward gang member or was a Sureño.  Padilla was not in a gang and had never been in a gang.  In a second encounter, defendant approached Padilla outside of his apartment and asked him if he belonged to a gang and mentioned "Northside Hayward."  Padilla ran upstairs and locked the door of his apartment.  Padilla also would see defendant hanging out with friends at the corner liquor store in the neighborhood.  Padilla positively identified defendant as the shooter in a photographic lineup.

Padilla's sister had seen defendant before passing by her apartment with his friends.  She had seen him make gang hand gestures and knew his nickname was "Speedy."  After the shooting, she identified him from a photographic lineup.

2

None of the van passengers were injured.  The van had bullet holes in the gas tank, driver's side door, the hatchback, and both driver's side tires.  There were also three bullet holes in a truck parked across the street and one in a fence across the street.  The police found eight shell casings at the end of the driveway, from Smith & Wesson .40-caliber rounds.  The handgun used was a semi-automatic that feeds a new round into the chamber every time a round is fired.

The day after his arrest, defendant made a telephone call from jail to a relative named "Melissa."  In the call, which was recorded and played for the jury, defendant said:  "Look, there's a number in there, right?  It's under Shawn.  Call him up, tell him I'm in jail, and tell him that I need him to do me a big favor, and to make sure dude don't come to court-his family don't come to court.  They live right there in, uh, in apartments right there, so I need you to start letting people know to make sure they don't come to court."

Testimony regarding a series of police contacts with defendant from 2002 through 2005, established that defendant was a member of Northside Hayward Gang (NHG), affiliated with the Norteños.  Colby Staysa, a sergeant with the Alameda County Sheriff's Department and gang expert, testified about the history of the NHG, and the characteristic behaviors and criminal activities engaged in by gang members.  He opined that NHG members engage in a pattern of criminal activity and testified to specific criminal acts committed by known gang members.  Based on his review of police documents, interviews with Hayward police officers, and conversations with the sheriff's office's lead investigator assigned to the shooting, Staysa further opined that defendant was a member of NHG and that the shooting was committed for the benefit of NHG in order to promote its violent reputation. In Staysa's opinion, defendant's jail telephone request to "Melissa" was also done to promote the gang's reputation and to assist the gang.

**B. Defense Case**

Rashawn "Shawn" Mitchell, who had known defendant for about two years, witnessed the shooting from the porch of his home.  Mitchell saw a man wearing a black hoodie get out of the passenger side of a small car and walk toward the back of the apartment building.  Within about 15 seconds, a van drove down the driveway toward the street and Mitchell heard several shots; he saw the man in the hoodie walk down the driveway, and get back in the car which drove away.  Mitchell did not recognize the man in the hoodie but knew he was not defendant.

While Padilla testified the shooter held the gun in his right hand, defendant's mother testified that defendant is left-handed and cannot fully bend his right index finger due to an injury suffered several years earlier.

*Hurtado*, 2009 WL 4643729 at *1-2 (footnotes omitted).

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

2   unreasonable application of, clearly established Federal law, as determined by the

3   Supreme Court of the United States; or (2) resulted in a decision that was based on an

4   unreasonable determination of the facts in light of the evidence presented in the State court

5   proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to

6   mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09

7   (2000), while the second prong applies to decisions based on factual determinations, *See*

8   *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

9        A state court decision is "contrary to" Supreme Court authority, that is, falls under the

10  first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

11  reached by [the Supreme] Court on a question of law or if the state court decides a case

12  differently than [the Supreme] Court has on a set of materially indistinguishable facts."

13  *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application

14  of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

15  identifies the governing legal principle from the Supreme Court's decisions but

16  "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The

17  federal court on habeas review may not issue the writ "simply because that court concludes

18  in its independent judgment that the relevant state-court decision applied clearly

19  established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must

20  be "objectively unreasonable" to support granting the writ. *Id.* at 409.

21       Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

22  determination will not be overturned on factual grounds unless objectively unreasonable in

23  light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at

24  340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

25       When there is no reasoned opinion from the highest state court to consider the

26  petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*,

27  501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.

28  2000). However, when presented with a state court decision that is unaccompanied by a

4

United States District Court
For the Northern District of California

1  rationale for its conclusions, a federal court must conduct an independent review of the

2  record to determine whether the state-court decision is objectively unreasonable.  *See*

3  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  This review is not a "de novo review

4  of the constitutional issue;" rather, it is the only way a federal court can determine whether

5  a state-court decision is objectively unreasonable where the state court is silent.  *See*

6  *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  "[W]here a state court's decision is

7  unaccompanied by an explanation, the habeas petitioner's burden still must be met by

8  showing there was no reasonable basis for the state court to deny relief." *See Harrington v.*

9  *Richter*, 131 S. Ct. 770, 784 (2011).

10  **DISCUSSION**

11  As grounds for federal habeas relief, petitioner asserts that: (1) the trial court

12  violated his right to a fair trial by denying his challenge for cause as to Juror No. 10; (2) his

13  trial counsel was ineffective for (i) failing to investigate and present corroborating evidence,

14  and (ii) failing to file a motion to suppress identification evidence; and (3) the admission of

15  expert testimony on the gang enhancement rendered the trial fundamentally unfair.

16  Petition for Writ of Habeas Corpus ("Hab. Pet.") at 6.

17  **I.     Juror Challenge**

18  Petitioner claims that the trial court's denial of his challenge for cause to juror No.

19  10 deprived him of his constitutional right to be tried by an impartial jury.  Hab. Pet. at 6

20  claim one.

21  **A.  Trial Court Proceedings**

22  Juror No. 10 was a loan processor who had never served on a jury and had never

23  been the victim of a crime.  Resp. Exh. 9 Volume ("V") 3 at 681-82.  Asked by the court if

24  she could think of any reason why she could not be completely fair and impartial, she

25  responded, "I guess not.  No."  *Id.* at 683.  Defense counsel then asked why she hesitated

26  when answering the court's question about fairness and impartiality, and she responded, "I

27  just – I don't know what the hesitation was.  I just thought, why wouldn't I be?  I can be as

28  fair and impartial as anyone else."  *Id.* at 683.  Juror No. 10 further stated that, to the best

United States District Court

For the Northern District of California

of her ability, she would listen to all the evidence and would follow the court's instructions

as to what law is to be applied in the case. *Id.* at 685.  The following exchange then took

place between defense counsel and Juror No. 10:

> [Defense Counsel]: In reading the Information, when you first heard it, did you have any feelings like it's more likely than not Mr. Hurtado's guilty just because he's sitting here?
>
> A: Probably.
>
> Q: You heard the judge instruct us that there's a presumption of innocence. Do you recall that?
>
> A: Um-hum.
>
> Q: And would you follow that instruction of presumption of innocence?
>
> A: I don't know. I think I've probably already in my mind decided.
>
> Q: Already you've decided?
>
> A: Um-hum.
>
> Q: What's your decision, Madam Juror?
>
> A: I just think if he's made it this far, it wasn't for doing nothing.
>
> Q: Did you base your decision on the reading of the information?
>
> A: Yes. [¶] ... [¶]
>
> Q. So, in summary, how do you stand right now: Guilty or not guilty?
>
> A. I would lean towards guilty.

*Id.* at 685-86.

The prosecutor began his voir dire examination of Juror No. 10 by emphasizing that

one of the rules all jurors had to apply was the presumption of innocence, which meant that

the defendant was presumed innocent until the district attorney convinced the jury beyond

a reasonable doubt of his guilt. *Id.* at 688.  The prosecutor asked Juror No. 10 if she could

follow that rule, and she responded, "I don't know.  I mean, I don't know. I have already

kind of come up with an idea as I think the process has already made it to this point.  I don't

see how it could be that much innocence.  So maybe I can't follow those rules." *Id.*  The

prosecutor tried to find out if she was at a point where she could not be fair and impartial,

asking: "Is that where you are?  You can't make that promise?"  *Id.* at 688-89.  Juror No. 10 responded, "I guess not, yeah. I can't."  *Id.* at 689.

The court took its turn to address Juror No. 10, educating her on the role of the jury in the criminal justice system, and making it clear that she could not judge the defendant's guilt merely because he was arrested and brought to trial.  *Id.* at 689-90.  The court emphasized that a juror had to hear the evidence from both sides before deciding whether there was proof beyond a reasonable doubt.  *Id.* at 690.  Juror No. 10 responded by saying, "I don't know that I agree."  *Id.*  The court then asked whether she would convict based on either a strong suspicion of guilt or whether there was probable cause to arrest.  Juror No. 10 stated, "No.  I don't think that's enough to convict.  I know I have to listen to all the evidence, of course."  *Id.*  The court went on to explain that the entire process involved arriving at a decision based on evidence that was presented, which required her to put aside the fact of the arrest.  *Id.* at 691-92.  The court asked Juror No. 10 if she could do that, and she responded,  "[w]ell, if you put it that way, yeah.  I mean, if I just have to listen to the evidence and decide, I mean, I could hear a lot of evidence and decide based on that."  *Id.* at 692.  The court made it clear that it was the responsibility of the citizens to determine whether there was proof beyond a reasonable doubt, but she had to look inside her own mind and tell the court whether she was able to do that.  *Id.*  Juror No. 10 responded by saying, "I think I would be able to do it.  I just don't honestly know if its something I want to do."  *Id.* at 693.  The following exchange then took place:

> [The Court]: To be blunt, you've been drafted.  If I had to get 12 people that wanted to come in and do jury duty, this would become a very lonely place.  But it's like I say, there is no such thing as a right that does not have a cost involved with it....
>
> So do you think you can go ahead and put aside any assumptions you may have concerning the arrest or the charging of the defendant and go strictly on the law and the evidence that gets presented here?
>
> A:  Yeah, I guess.

*Id.* at 693.

The prosecutor resumed questioning Juror No. 10.  *Id.* at 693.  She confirmed that

United States District Court

For the Northern District of California

1   she did not know anyone else in the room or anyone connected with the case and had no

2   religious or personal views that affected her ability to serve as a juror.  *Id.* at 695.  She had

3   previously been to court for divorce and child custody proceedings, and, as a teenager, for

4   having alcohol.  *Id.* at 696-97.  She admitted to spending the night in jail for a DUI twelve or

5   thirteen years earlier, and ultimately entered a guilty plea.  *Id.*  She further indicated that

6   she did not have much confidence in the judicial system and thought that things could be

7   done better.  *Id.* at 699.  The prosecutor explained that this was a common feeling among

8   jurors, but needed to know whether her dissatisfaction with the system made her favor one

9   side over the other.  *Id.* at 699.  Juror No. 10 stated that she could not answer the question

10  without listening to the "testimony and everything" to see what she thought.  *Id.* at 699.  The

11  prosecutor explained to her that that was exactly what everyone wanted, and asked for her

12  assurance that she would not judge the defendant's guilt based on her mistrust of the

13  system.  *Id.* at 699-700.

14      The prosecutor later returned to the issue of standard of proof, and asked Juror No.

15  10 whether she could promise to apply the presumption of innocence.  *Id.* at 703.  She

16  responded by saying, "[i]f that's what I'm instructed to do, I guess yes, I would."  The

17  following exchange then took place:

18      [The Prosecutor]:  With the judge's explanation of what the presumption
        of innocence means and how it applies, are you comfortable saying yes, I
19      will presume him to be innocent, I will reserve judgment until I've heard all
        the evidence, and if I am satisfied of guilt beyond a reasonable doubt, I'll
20      vote guilty, and if I'm not, I'll vote not guilty?  Can you promise to do that?

21      A:  I don't know if-because I already said that I thought he might be guilty-if
        I could say yes, I would presume him innocent.  That's contradictory.
22
        Q:  No.  Because lots of jurors come in here and their initial reaction is,
23      hey, if I can honestly tell you, they can say I think he might be.  It's okay.
        That's a human feeling; that's honest emotion.
24
        [O]ur rule is that .... [u]ntil you've heard all the evidence, you have to
25      presume he's not guilty.  We ask you to follow that rule even though you
        may have had an initial reaction.  Everyone has initial reactions to people.
26
        Can you do that?
27
        A:  Yeah.
28

8

Q: And then just in general terms. ... [l]et's say you're selected. ... [l]ets say you sit there and say, you know what?  I'm not sure, I don't believe that they proved it beyond a reasonable doubt, could you vote not guilty?

A: Yes

The court then asked one final question:

[The Court]: And I frequently tell folks, I've been doing this for a long time, I've seen probably a few hundred trials over the years, and, to be real blunt, I really couldn't care less who wins and who loses in a trial, but what I do care about is that both sides get a fair trial.

Are you in a position where you can say that you can give both sides a fair trial?

A: I think I can be fair.

*Id.* at 703-06.

Defense counsel declined further questioning and challenged Juror No. 10 for cause.[1]  *Id.* at 706.  The court denied the defense challenge as follows:

What happens is this is a different process.  This is, like I say, different from the television, the newspapers.  And very frequently people come in and it's all very foreign, and so thinking about some of these things is a very different process.  To a certain extent we ask people to readjust and to think about it.  That's part of the reason why I read that reasonable doubt instruction at the very beginning, because people are frequently confused and think that it involves proof beyond all possible doubt.  And it does not.

And it seems to me that that's what we're talking about, that you have indicated clearly that you can give both sides a fair trial here now that you understand better what it's all about.

So the challenge for cause would be denied.

*Id.*

**B.  California Court of Appeal Opinion**

On direct appeal, petitioner claimed that the trial court prejudicially erred by failing to uphold his challenge for cause to Juror No. 10.  *Hurtado*, 2009 WL 4643729 at *3.  The Court of Appeal found that Juror No. 10 simply vocalized feelings that were common to many jurors after hearing the charges and seeing the defendant in the courtroom, and that

---

[1]Counsel had exhausted all of his peremptory challenges before Juror No. 10 was questioned.  *Hurtado*, 2009 WL 4643729 at *5.

United States District Court

For the Northern District of California

1  "she was not unique in bringing preconceptions about the legal process into the case." *Id.*

2  at *6. The Court of Appeal concluded that, even though her statements may have been

3  conflicting or equivocal, the trial court's determination of the juror's true state of mind, was

4  binding upon a reviewing court. *Id.* Accordingly, the Court of Appeal upheld the trial court's

5  denial of petitioner's motion to excuse Juror No. 10 for cause. *Id.* at 6-7.

6  **C. Legal Standard**

7  A trial court may exclude for cause any prospective juror who will be unable to

8  render an impartial verdict based on the evidence. *See Irvin v. Dowd*, 366 U.S. 717, 723-

9  24 (1961). A prospective juror must be removed for cause if his views or beliefs would

10  prevent or substantially impair the performance of his duties as a juror in accordance with

11  his instructions and his oath. *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985). The bias

12  or prejudice of even a single juror is enough to violate the Sixth Amendment's guarantee of

13  a verdict by an impartial jury. *See United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th

14  Cir. 2000). The trial court's determination as to whether a prospective juror can faithfully

15  and impartially apply the law is entitled to deference, and the state court's findings on

16  factual issues are entitled to a presumption of correctness on federal habeas review. *See*

17  *Wainwright,* 469 U.S. at 426.

18  To disqualify a juror for cause requires a showing of actual bias or implied bias, that

19  is "bias in fact or bias conclusively presumed as a matter of law." *See Gonzalez*, 214 F.3d

20  at 1111-12 (citation omitted). To determine whether there is actual bias, a court must

21  examine the juror's answers on voir dire for evidence that she was in fact partial. *Id.* at

22  1112. The issue for implied bias is whether an average person in the juror's position would

23  be prejudiced, e.g. where a relationship between the juror and some aspect of the litigation

24  is such that it is highly unlikely that the average person could remain impartial in his

25  deliberations. *Id.* The presence of a biased juror cannot be harmless; the error requires a

26  new trial without a showing of actual prejudice. *See Dyer v. Calderon*, 151 F.3d 970, 973 n.

27  2. (9th Cir. 1998).

28

United States District Court

For the Northern District of California

1

### D. Discussion

2    Petitioner contends that he did not receive a fair trial because, during voir dire, Juror

3 No. 10 expressed the belief that he was more likely than not guilty, and stated that she

4 could not apply the presumption of innocence.  Hab. Pet. at 6 claim one.

5    Petitioner correctly points out that Juror No. 10 initially stated that she had already

6 made up her mind regarding his guilt, and that she would have difficulty applying the

7 presumption of innocence.  Resp. Exh. 9 V3 at 685-86, 687-88.  However, Juror No. 10's

8 honest disclosure of her feelings merely served as a starting point from which the parties,

9 through further questioning, were able to flesh out her views, thereby allowing the court to

10 ascertain her true state of mind and determine whether she could perform her oath and

11 duties as a juror.  After the court explained the role of the jury within the criminal justice

12 system, the requirement of proof beyond a reasonable doubt, and the fact that an arrest

13 and charge is not evidence of guilt, Juror No. 10 indicated that she could make a decision

14 based strictly on the law and the evidence that was presented.  *Id.* at 690-93.  Moreover,

15 Juror No. 10 assured the prosecutor that, despite her initial reaction toward the defendant,

16 she could presume that he was innocent until, after hearing all the evidence, she was

17 convinced of his guilt beyond a reasonable doubt.  *Id.* at 703-05.  Finally, after the court

18 explained the importance of guaranteeing both sides a fair trial, Juror No. 10 assured the

19 court that she could be fair.  *Id.* at 705-06.  Based on Juror No. 10's answers to the

20 questions posed to her on voir dire, the trial court reasonably determined that there was no

21 evidence of actual bias.  The trial court's denial of petitioner's motion to remove Juror No.

22 10 for cause is entitled to deference, and the appellate court's factual finding that the trial

23 court's ruling was supported by the record is entitled to a presumption of correctness on

24 federal habeas review.  *See Wainwright,* 469 U.S. at 426.

25    The California Court of Appeal's decision upholding the trial court's ruling on

26 petitioner's challenge for cause to Juror No. 10 was not contrary to, or an unreasonable

27 application of, clearly established federal law, or based on an unreasonable determination

28 of the facts in light of the state court record.  *See* 28 U.S.C. § 2254(d).

**II.     Ineffective Assistance of Counsel**

    **A.  Legal Standard**

        In order to succeed on an ineffective assistance of counsel claim, the petitioner must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires him to show deficient performance and prejudice.  Deficient performance requires a showing that trial counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms.  *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  To establish prejudice, petitioner must show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *See Strickland*, 466 U.S. at 694.  If a petitioner cannot establish that defense counsel's performance was deficient, it is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test.  *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

        Petitioner's ineffective assistance of counsel claim was first raised in a petition for writ of habeas corpus before the California Supreme Court.  Resp. Exh. 7.  Because the Supreme Court summarily denied the petition with no explanation, the court must conduct an independent review of the record to determine whether the state court decision denying petitioner's claims of ineffective assistance of counsel is objectively unreasonable.  *See Delgado*, 223 F.3d at 982.

    **B.  Failure to Investigate and Present Evidence**

        Petitioner first claims that trial counsel was ineffective for failing to investigate and present corroborating evidence to support his defense.  Hab. Pet., claim two.  Specifically, petitioner contends that he asked trial counsel to obtain x-rays of his right index finger, which had previously been broken and had not healed correctly.  *Id.*  The California Supreme Court summarily rejected this claim.  Resp. Exh. 7-8.

        **i.  Factual Background**

        At trial, both Arlen and his sister Iliana Padilla, testifying for the prosecution, identified petitioner as the man who shot at their van while they were leaving Iliana's friend's house

United States District Court

For the Northern District of California

1   with their mother.  Resp. Exh. 9 V5 at 786-91, 877.  Arlen Padilla further testified that

2   petitioner fired the gun with his right hand.  *Id.* at 799, 833-34.  Petitioner's mother, Chantel

3   Ontiveros, testifying on behalf of the defense, stated that petitioner was left-handed and that

4   he never used his right hand.  Resp. Exh. 9 V9 at 1309.  She further testified that petitioner

5   broke the index finger on his right hand several years earlier and that it never healed

6   properly, making it impossible for him to properly close that hand.  *Id.* at 1309-10.  During

7   his closing argument, defense counsel emphasized for the jury Arlen Padilla's testimony that

8   the shooter held the gun in his right hand.  Resp. Exh. 9 V10 at 1396.  Counsel then

9   highlighted Ontiveros's testimony indicating that petitioner was left-handed, and argued that

10  he could not have pulled a trigger with his right hand because that index finger was

11  paralyzed.  *Id.*

12         **ii.  Discussion**

13         Petitioner argues that an x-ray of his right index finger would have corroborated his

14  mother's testimony and raised substantial doubt as to whether it was possible for him to

15  have fired a gun with his right hand.  Hab. Pet., claim 2, Traverse at 16.  There was no

16  expert or medical testimony adduced at trial bearing on the effect, if any, the injury to

17  petitioner's right index finger may have had on his ability to fire a weapon.  In his traverse,

18  petitioner has submitted a report of an x-ray that was taken of his right index finger while he

19  has been in prison for the instant offense.  Traverse Exh. D.  Far from proving his point, the

20  report only serves to reinforce the need for a medical expert to interpret an x-ray report.  A

21  favorable interpretation could have conceivably helped his defense, but an unfavorable

22  report could well have undermined it.  "[C]ounsel has a duty to make reasonable

23  investigations or to make a reasonable decision that makes particular investigations

24  unnecessary."  *See Strickland*, 466 U.S. at 690-91.  Here, counsel made a strategic choice

25  to rely on the testimony of petitioner's mother, enabling him to argue that the jury should

26  draw an inference that petitioner could not have fired the gun because he was left-handed

27  and had suffered an injury to his right hand.  Counsel's strategic decision not to obtain an x-

28  ray was reasonable as there is no indication that expert testimony interpreting an x-ray

13

United States District Court

For the Northern District of California

1  would have helped his defense and, in fact, could have harmed his defense.  *Id.*  Defense

2  counsel is empowered to make such strategic decisions, so long as they are reasonable and

3  informed.  *See Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002).  Counsel's

4  performance in this regard was not deficient.

5          Even assuming that counsel's performance was deficient for failing to thoroughly

6  investigate the foregoing possibility, petitioner's claim fails for lack of prejudice because he

7  cannot demonstrate a reasonable probability that the result of the proceeding would have

8  been different.  *See Strickland*, 466 U.S. at 694.  Defense counsel offered the testimony of

9  petitioner's mother, who stated that he was left-handed and that the injury to his right index

10  finger prevented him from closing his hand.  Resp. Exh. 9 V9 at 1309.  During his closing

11  argument counsel asked the jury to consider whether, in light of his "paralyzed right index

12  finger," petitioner could have actually fired the gun.  *Id.* V10 at 1396.  The jury clearly found

13  this argument insufficient to overcome the eyewitness testimony of Arlen and Iliana Padilla

14  identifying petitioner as the shooter.  Moreover, petitioner's speculative argument that an x-

15  ray of his right index finger would have corroborated his mother's testimony and raised

16  reasonable doubt in the jury's mind about whether it was possible for him to have fired the

17  weapon, is insufficient to establish prejudice.  *See Gonzalez v. Knowles*, 515 F.3d 1006,

18  1015-16 (9th Cir. 2008) (speculation about what the evidence might have shown had certain

19  steps been taken is insufficient to establish prejudice).

20          **C. Failure to File Motion to Suppress Identification**

21          Petitioner also claims that trial counsel was ineffective for failing to file a motion to

22  suppress the identification based on a suggestive photographic lineup.  Hab. Pet., claim

23  three.  Specifically, petitioner claims that the six-pack photo lineup was unduly suggestive

24  because his was the only photo that actually fit the description of the suspect that was given

25  by the victims.  Hab. Pet., claim 3, Traverse at 17.

26          **i. Legal Standard**

27          The United States Supreme Court has clearly established that an identification

28  procedure may be so prejudicial as to amount to a denial of due process.  *See Simmons v.*

14

United States District Court

For the Northern District of California

1   *United States*, 390 U.S. 377, 383 (1968).  A challenge to an identification procedure is

2   reviewed under the totality of the circumstances.  *Id.*  Convictions based on an eyewitness's

3   identification at trial which followed a pre-trial identification by photograph will be set aside

4   only if the photographic identification procedure was so impermissibly suggestive as to give

5   rise to a substantial likelihood of irreparable misidentification.  *Id.* at 384.  "[R]eliability is the

6   linchpin in determining the admissibility of identification testimony." *See Manson v.*

7   *Brathwaite*, 432 U.S. 98 (1977).  In determining whether identification testimony is reliable, a

8   court must weigh "the corrupting effect of the suggestive identification" against the following

9   five factors:  (1) the opportunity of the witness to view the criminal at the time of the crime;

10  (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the

11  level of certainty the witness displays at the time of the identification; and (5) the time

12  between the crime and the identification.  *See Manson*, 432 U.S. at 114.  In weighing these

13  factors, the court's ultimate goal is to determine whether, under all the circumstances, there

14  is a very substantial likelihood of irreparable misidentification.  *Id.* at 116.  Short of that, the

15  identification testimony is properly received and any flaws in the procedures used are for the

16  jury to weigh. *Id.*

17        **ii. Discussion**

18        Arlen Padilla testified that, on the night of the shooting, he, his mother, and his sister

19  were in his van exiting the driveway of his sister's friend's house, when he noticed someone

20  standing on the lawn next to the sidewalk.  Resp. Exh. V5 at 790.  Although it was nighttime

21  there was enough light for Arlen to see that the person was dressed all in black, with a black

22  beret, and shoulder length hair.  *Id.* at 791-95.  As Arlen drove past the person, he heard

23  about nine or ten gunshots.  *Id.* at 798.  He turned to look, and saw the person shooting a

24  handgun at the van.  *Id.*  at 799.  Iliana Padilla was in the passenger seat of the van and

25  testified that, as her brother was exiting the driveway, she saw a man dressed in a black

26  jacket standing right next to the van, and then heard multiple gunshots.  *Id.* at 853.  Arlen

27  and Iliana were both interviewed by police at the crime scene shortly after the shooting, and

28  each provided a description of the shooter.  Resp. Exh. V6 at 947.  Based on their

**United States District Court**
For the Northern District of California

1   description, a photo lineup was prepared and shown to them at the crime scene, and both

2   Arlen and Iliana separately identified petitioner as the shooter. *Id.* at 947-48.  Petitioner was

3   later identified by the victims in court.  Resp. Exh. 9 V5 at 791-95, 855-57.  Additionally,

4   Arlen recognized the shooter as someone who had accosted him on two separate occasions

5   within the past year, asking him in a threatening manner about his gang affiliation. *Id.* at

6   815-821.  Similarly, Iliana testified that she had seen the shooter passing in front of their

7   house on several occasions flashing gang signs. *Id.* at 866-69.

8       Both victims had an opportunity to view the shooter at the time of the crime and

9   described the shooter with sufficient accuracy to enable police to immediately prepare a

10  photo lineup based on their description, and both victims separately identified petitioner as

11  the shooter within a short time after the crime.  There is no suggestion of any police practice

12  that tainted the identification procedure.  Under the totality of the circumstances, the

13  photographic identification procedure was not so impermissibly suggestive as to give rise to

14  a substantial likelihood of irreparable misidentification, and it was properly left for the jury to

15  determine the credibility of the eyewitness identifications.

16      Because there was no basis to suppress the identification, it stands to reason that

17  counsel was not ineffective for failing to file a motion to suppress the identification. *See*

18  *Moormann v. Ryan*, 628 F.3d 1102, 1109-10 (9th Cir. 2010) *quoting Boag v. Raines*, 769

19  F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute

20  ineffective assistance.") .

21      **D. Conclusion**

22      Accordingly, the state court's decision denying petitioner's claims of ineffective

23  assistance of counsel was not objectively unreasonable. *See Delgado,* 223 F.3d at 982.

24  **III.    Expert Testimony re: Gang Enhancement**

25      Petitioner claims that he was denied a fair trial by the admission of the gang expert's

26  opinion testimony.  Hab. Pet., claim 4.  Specifically, petitioner contends that the expert's

27  opinion that he was an active gang member was based on information and statements in

28  field identification cards gathered by several different investigating officers without his

consent and in violation of his *Miranda* rights.   *Id.*, Traverse at 18-19.

### A. Factual Background

Hayward Police Sergeant Colby Staysa testified as an expert witness in the investigation of gang-related crime in Alameda County.   Resp. Exh. V7 at 1103-04, 1107. As the supervisor of the gang suppression unit in the Alameda Sheriff's Department, Staysa reviewed the instant case to determine whether there were any gang-related aspects, and summarized his findings in a written report.   *Id.* at 1123-24.   Staysa's report, which was based on his review of police documents, interviews with Hayward police officers, and conversations with the lead investigator assigned to the case, concluded that petitioner was an active member of the Northside Hayward gang at the time of the shooting.   *Id.* at 1124.

Staysa relied on a number of police documents in formulating his opinion that petitioner was an active gang member.   The first police report Staysa testified about described petitioner's arrest for spraying gang-related graffitti displaying his nickname, Speedy, while dressed in gang colors and gang-related clothing.   *Id.* at 1125-27.   After reviewing the report, Staysa opined that petitioner, by admitting his gang membership at the time of his arrest, was seeking recognition from the gang for committing the crime in order to bolster his reputation within the gang.   *Id.* at 1127-28.   Staysa further testified that gang investigators used field identification cards ("F.I.") cards that were created following each contact with a suspected gang member.   *Id.* at 1133-34.   These were note cards with boxes to check for identifying information and space to write relevant notes about the contact, and served to memorialize the informal interview to help the investigating officer remember details of that contact.   *Id.* at 1134.   Staysa emphasized the importance of using F.I. cards and collecting them from other officers, and explained that, as an expert in gang investigations, he relied upon them to formulate an opinion as to whether someone was a gang member.   *Id.* at 1134-35.   The prosecutor then went over a number of F. I. cards prepared by different officers describing contacts with petitioner and other individuals, and Staysa provided a detailed description of how he used the information in those cards to formulate his opinion that petitioner was a gang member.   *Id.* at 1135-67.   The F.I. cards

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

themselves were not admitted into evidence. *Id.* at 1238, 1242-44. Staysa also testified regarding another incident described in a police report prepared by the Hayward Police Department, as well as several jail classification sheets documenting petitioner's multiple bookings into the county jail. *Id.* at 1167-74. Cumulatively, the foregoing information led Staysa to conclude that, in his expert opinion, petitioner was an active gang member.

After examining Staysa concerning this information, the prosecutor, in hypothetical fashion, described the facts of the instant case and asked Staysa for his opinion as to whether the shooting was done for the benefit of, or in association with a criminal street gang. *Id.* at 1179. Staysa responded that it was his opinion that the crime was committed for the benefit of the Northside Hayward street gang, with the specific intent to promote the gang's violent reputation. *Id.* Staysa then provided a narrative description of how he formulated his opinion that the crime was committed for the benefit of the Northside Hayward street gang. *Id.* at 1179-83. Defense counsel objected and moved to strike the testimony and asked for a mistrial, arguing that the expert was not merely offering an opinion on gang membership, but was invading the province of the jury by giving his opinion on the ultimate issue of guilt or innocence. *Id.* at 1184. After hearing argument from both sides, the court overruled the objection and denied the motion for a mistrial. *Id.* at 1188-1193.

**B. Legal Standard**

Evidence erroneously admitted warrants habeas relief only when it results in the denial of a fundamentally fair trial in violation of the right to due process. *See Briceno v. Scribner*, 555 F.3d 1069, 1077 (9th Cir. 2009) *citing Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *See Estelle* at 67-68. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Id.* The court's habeas powers do not allow for the vacatur of a conviction "based on a belief that the trial judge incorrectly interpreted the California Evidence Code in ruling" on the admissibility of evidence. *Id.* at 72.

California Evidence Code section 801(b) allows an expert witness to give opinion testimony if the opinion is "[b]ased on matter ... perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates."  California Evidence Code § 801.

There is no clearly established law supporting the "proposition that the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact." *See Briceno*, 555 F.3d at 1078.  "Although a witness is not permitted to give a direct opinion about the defendant's guilt or innocence .... an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact."  *See Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009) (citation omitted, internal quotations omitted).

This claim also was first raised in a habeas petition before the California Supreme Court.  Resp. Exh. 7.  Again, because the California Supreme Court summarily denied the petition with no explanation, the court must conduct an independent review of the record to determine whether the state court decision denying petitioner's claim was objectively unreasonable.  *See Delgado*, 223 F.3d at 982.

**C.  Discussion**

Petitioner claims that he was denied a fair trial because the gang expert's opinion that he was an active gang member was based on information and statements contained in field identification cards that were gathered in violation of his *Miranda* rights.  The question presented on federal habeas review is whether the admission of the gang expert's testimony violated petitioner's federal constitutional rights.  In light of the fact that the expert relied on information that was permissible under California law, and of a type that would reasonably be relied upon by experts in the field, this question can be answered in the negative.  *See Estelle*, 502 U.S. at 67-68.  Although Staysa's opinion testimony was based, in part, on information from F.I. cards that may have been inadmissible at trial for one reason or another, the information in those cards nevertheless provided him with a valid basis on which to formulate an opinion that petitioner was a member of the North Hayward street

gang at the time of the shooting.  *See* California Evidence Code section 801(b).  Whether the information contained multiple levels of hearsay, or was gathered in violation of petitioner's *Miranda* rights is irrelevant, because Staysa reasonably relied upon the information in formulating his expert opinion that petitioner was an active gang member. Admission of the expert testimony did not violate petitioner's right to a fair trial.

To the extent that petitioner argues that the gang expert's opinion testimony was improper because he offered an opinion on the ultimate fact of guilt or innocence, this claim also fails.  *See Briceno*, 555 F.3d 1069, 1077-78 (there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue).

### D.  Conclusion

Accordingly, the state court's decision denying petitioner's claim was not objectively unreasonable.  *See Delgado,* 223 F.3d at 982.

## IV.    Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

To obtain a COA, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that one issue presented by petitioner in his petition meet the above standard and accordingly GRANTS the COA as to that issue.  *See generally Miller-El*, 537 U.S. at 322.

The issues is:

(1) whether the trial court violated the petitioner's right to a fair trial by denying his

United States District Court

For the Northern District of California

challenge for cause as to Juror No.10.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

A Certificate of Appealability is **GRANTED**.  *See* Rule11(a) of the Rules Governing Section 2254 Cases.

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: April 16, 2013, 2013.

_____
PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.11\HURTADO0037.HC.wpd